## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MATTHEW W. COVIELLO, NATHAN BYRNE and VICTORIA HALSTED, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>BHS MANAGEMENT SERVICES, INC., THE BOARD OF DIRECTORS OF BHS MANAGEMENT SERVICES, INC. and JOHN DOES 1-20.<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CIVIL ACTION NO.:**

**CLASS ACTION COMPLAINT**

## COMPLAINT

Plaintiffs, Matthew W. Coviello, Nathan Byrne and Victoria Halsted ("Plaintiffs"), by and through their attorneys, on behalf of the BHS Partnership 403(b) Pension Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include BHS Management Services, Inc. ("BHS" or "Company") and the Board of Directors of BHS Management Services, Inc. and its members during the Class Period[2] ("Board") for breaches of their fiduciary duties.

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period, as will be discussed in more detail below, is defined as December 30, 2014 through the date of judgment.

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar. 27, 2020) (quoting *Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

3.    The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      Most participants in defined contribution plans like 401(k)or 403(b) plans expect that their accounts will be their principal source of income after retirement.  Although at all times plan accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.      At all times during the Class Period (December 30, 2014 through the date of judgment) the Plan had at least 330 million dollars in assets under management.  At the end of 2019 and 2018, the Plan had over 553 million dollars and 457 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

10.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses

or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs.

12.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One).

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.     PARTIES

**Plaintiffs**

17.      Plaintiff, Matthew W. Coviello ("Coviello"), resides in Rensselear, New York. During his employment, Plaintiff Coviello participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

18.     Plaintiff, Nathan Byrne ("Byrne"), resides in Longmeadow, Massachusetts. During his employment, Plaintiff Byrne participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.      Plaintiff, Victoria Halsted ("Halsted"), resides in Adams, Massachusetts. During her employment, Plaintiff Halsted participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

21.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available

alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

22.     BHS is the Plan sponsor and a named fiduciary with a principal place of business being 725 North Street, Pittsfield, Massachusetts.  The December 31, 2019 Form 5500 filed with the United States Department of Labor ("2019 Form 5500") at 1. BHS describes itself as "the region's leading provider of comprehensive healthcare services.[4]"

23.     BHS determines the appropriateness of the Plan's investment offerings and monitors investment performance. *See*, the Basic Plan Document of the BHS Partnership 403(b) Pension Plan effective March 25, 2020 ("Plan Doc.") at 71. As will be discussed below, BHS fell well short of these fiduciary standards.

24.     BHS also made discretionary decisions to make profit sharing and employer matching contributions to the Plan each year. As detailed in the Plan Doc, BHS "will make a Nonelective Contribution (in the dollar amount or percentage determined by the Employer in its sole discretion … ." Plan Doc. at 44.

25.     Accordingly, BHS during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over management or disposition of Plan.

26.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

---

[4] http://www.berkshirehealthsystems.org/AboutUs

**Board Defendants**

27.    BHS, acting through its Board of Directors, determines the appropriateness of the Plan's investment offerings and monitors investment performance. *See*, Plan Doc. at 71. As will be discussed below, the Board fell well short of these fiduciary standards.

28.    BHS, acting through its Board of Directors, also made discretionary decisions to make profit sharing and employer matching contributions to the Plan each year. As detailed in the Plan Doc, BHS "will make a Nonelective Contribution (in the dollar amount or percentage determined by the Employer in its sole discretion … ." Plan Doc. at 44.

29.    Accordingly, the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over management or disposition of Plan assets.

30.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

31.    The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Additional John Doe Defendants**

32.    To the extent that there are additional officers, employees and/or contractors of BHS who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 11-20

include, but are not limited to, BHS officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.    CLASS ACTION ALLEGATIONS

33.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between December 30, 2014 through the date of judgment (the "Class Period").

34.    The members of the Class are so numerous that joinder of all members is impractical.  The 2019 Form 5500 lists 5,532 Plan "participants with account balances as of the end of the plan year."  2019 Form 5500 at 2.

35.    Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

36.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are/were fiduciaries of the Plan;

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

B.    Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.    The proper form of equitable and injunctive relief; and

D.    The proper measure of monetary relief.

37.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

38.    This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

39.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

40.    BHS established the Plan "to provide retirement income benefits to Employees of the Participating Employer and to provide such Employees with an opportunity to accumulate

retirement savings on a tax deferred basis." Plan Doc. at 9. As will be discussed below, the Plan has been hindered in fulfilling its purpose by the fiduciary breaches of both BHS and the Board.

41.    As noted above, the Plan is a 403(b) Plan, which serves the same purpose as a 401(k) plan: as a vehicle for retirement savings.

42.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 56.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### Eligibility

43.    In general, regular full-time employees are eligible to participate in the Plan. *See,* the December 31, 2019 Report of Independent Auditor of the BHS Partnership 403(b) Pension Plan ("2019 Auditor Report") at 5. The 2019 Auditor Report provides that the Plan "is a defined contribution plan sponsored by BHS Management Services, Inc. (the "Company"), covering substantially all employees of the Company and participating employers." *Id.*

### Contributions

44.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions.  *Id.*

45.     With regard to employee contributions: "[p]articipants may contribute up to 80% of their gross compensation, as defined by the Plan, on a pre-tax basis, subject to Internal Revenue Code ("IRC") limitations." 2019 Auditor Report at 5. With regard to matching contributions made by BHS: "[p]articipant contributions are matched by the Company at a percentage of the participants' contributions equal to 50% of up to 4% of compensation for a maximum match of 2% of compensation." *Id.*

46.     Like other companies that sponsor 401(k) plans for their employees, BHS enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

47.     BHS also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

48.     Given the size of the Plan, BHS likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

49.     With regard to contributions made by participants to the Plan: "[p]articipants are immediately fully vested in that portion of their account which represents their contributions … ." 2019 Auditor Report at 6. Matching contributions made by BHS are subject to a 5 year vesting schedule based on years of continuous service. *Id.*

### *The Plan's Investments*

50.    In theory, BHS determines the appropriateness of the Plan's investment offerings and monitors investment performance. Plan Doc. at 71. As will be discussed in more detail below, BHS and/or the Board fell well short of these fiduciary goals.

51.    Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by BHS and/or the Board.

52.    The Plan's assets under management for all funds as of December 31, 2019 was $553,748,683.  2019 Auditor Report at 4.

### *Payment of Plan Expenses*

53.    During the Class Period, administrative expenses were paid for using Plan assets. As described in the 2019 Auditor Report: "[c]ertain administrative and investment fees are paid through the use of the Plan's unallocated expense reimbursement account." 2019 Auditor Report at 7.

## VI.    THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.    The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

54.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

55.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

56.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

57.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

58.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in *inter alia*, the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

### (1)    Defendants Failed to Adequately Monitor the Plan's Recordkeeping Expenses

59.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

60.    Although utilizing a revenue sharing approach is not per se imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total

investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

61.     In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees. In fact, as of 2019, the Plan is ranked by BrightScope, a leading 401(k) cost watch dog, as having one of the highest overall plan costs of any Plan with over 500 million dollars in assets under management[6].

62.     As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were astronomical when benchmarked against similar plans.

| Year | Participants | Total Comp to Transamerica | Credit Back to Part. | Total Cost | $PP |
|------|--------------|----------------------------|----------------------|------------|-----|
| 2014 | 4542 | $689,536.00 | $250,000.00 | $439,536.00 | $96.77 |
| 2015 | 4868 | $653,291.00 | $100,000.00 | $553,291.00 | $113.66 |
| 2016 | 5082 | $874,656.00 | $0.00 | $874,656.00 | $172.11 |
| 2017 | 5250 | $1,637,241.00 | $75,000.00 | $1,562,241.00 | $297.57 |
| 2018 | 5409 | $1,648,009.00 | $170,031.00 | $1,477,978.00 | $273.24 |
| 2019 | 5632 | $1,765,540.00 | $17,965.00 | $1,747,575.00 | $310.29 |

63.     By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

64.     The Plan had over five thousand participants making it eligible for some of the lowest fees on the market.

---

[6] https://www.brightscope.com/401k-rating/11619/Bhs-Management-Services-Inc/451746/Bhs-Partnership-403B-Pension-Plan last accessed on December 28, 2019.

65.     The Investment Company Institute ("ICI") conducted a study in 2016 where it calculated the average total plan costs from hundreds of 403(b) Plans ranging in size from the smallest plans having less than 1 million dollars in assets all the way up the nation's largest plans with assets under management of more than 1 billion dollars. *See, ICI* Study at 44. Looking at Plans that have between 250 Million dollars and 500 Million dollars, the ICI determined that the average total plan cost or TPC for 403(b) Plans with between 250 million and 500 million is .47% of total plan assets. Here, the Plan had a TPC of more than .77% or, in other words, more than 63% higher than the average.

66.     NEPC, a consulting group, recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[7] The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other. The median plan had $512 million in assets and 5,440 participants. *See* Report at 1.

67.     NEPC's survey found that the majority of plans with between 1,000 and 5,000 participants, to use the conservative number, paid slightly over $70 per participant recordkeeping, trust and custody fees. Report at 10. ***No plan*** with between 1,000 and 5,000 participants paid more than $79 per participant for recordkeeping. *Id.*

68.     Another data source, the *401k Averages Book* (20th ed. 2020)[8] studies plan fees for much smaller plans, those under $200 million in assets. Although it studies much smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a slightly bigger plan like the Plan should be paying for recordkeeping. That is because recordkeeping and administrative fees should ***decrease*** as a plan increases in size. For example, a

---

[7] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

[8] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information." *401k Averages Book* at p. 2.

plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant. *401k Averages Book* at p. 95. A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant. *Id.*, at p. 108. Thus, the Plan, with over $533 million dollars in assets and over 5,000 participants in 2019, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

69.     The Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[9]

70.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

71.     Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that

---

[9] Case law is in accord that large plans can bargain for low recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).

72.     The fact that the Plan has stayed with the same recordkeeper over the course of the Class Period, and paid the same relative amount in recordkeeping fees, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2014 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

73.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

> **(2)     Many of the Plan's Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans**

74.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in

similarly sized plans (conservatively, plans having between 250 million dollars and 500 million dollars in assets).

75.    In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [10]

76.    The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

77.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."  DOL 408(b)(2) Regulation Fact Sheet.

78.    Investment options have a fee for investment management and other services.  With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an

---

[10] *See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

79.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[11]

80.    For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans).  This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant.  However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power.  Large plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

81.    According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports."  "Best Practices for Plan Fiduciaries," at 37.

82.    "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking process.  For a fee, consultants can give plan sponsors a third-party perspective on quality and costs of services.  It is important to understand the plan (*e.g.,* plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information

---

[11] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

in order to put the results in an appropriate context.  By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison." *Id.*

83.    Here, the Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

84.    In some cases, expense ratios for the Plan's funds were ***293%*** above the ICI Median (in the case of Transamerica Balanced II R) and ***149%*** above the ICI Median (in the case of Eaton Vance Atlanta Capital SMID-Cap A) in the same category.  The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessively high expense ratios are detailed in the charts below:

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 ER** | **Investment Style** | **ICI Median[12]** |
| American Century Mid Cap Value R6 | 0.63 % | Domestic Equity | 0.47% |
| Calvert Conservative Allocation A | 1.06 % | Non-target date Balanced | 0.32% |
| Columbia High Yield Bond Adv | 0.78 % | Domestic Bond | 0.43% |
| Fidelity Real Estate Investment Port | 0.74 % | Domestic Equity | 0.47% |
| Invesco Oppenheimer Developing Mkts R5 | 0.88 % | International Equity | 0.50% |
| JPMorgan SmartRetirement 2020 A | 0.81 % | Target Date | 0.64% |
| JPMorgan SmartRetirement 2025 A | 0.85 % | Target Date | 0.64% |
| JPMorgan SmartRetirement 2030 A | 0.86 % | Target Date | 0.64% |
| JPMorgan SmartRetirement 2035 A | 0.87 % | Target Date | 0.64% |

[12] These Medians and Averages are taken from the BrightScope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans, 2016 ("ICI Study") at 55 and 47, respectfully,  available at https://www.ici.org/pdf/20_ppr_dcplan_profile_403b.pdf

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 ER** | **Investment Style** | **ICI Median[12]** |
| JPMorgan SmartRetirement 2040 A | 0.88 % | Target Date | 0.64% |
| JPMorgan SmartRetirement 2045 A | 0.88 % | Target Date | 0.64% |
| JPMorgan SmartRetirement 2050 A | 0.88 % | Target Date | 0.64% |
| JPMorgan SmartRetirement 2055 A | 0.88 % | Target Date | 0.64% |
| JPMorgan SmartRetirement 2060 A | 0.87 % | Target Date | 0.64% |
| JPMorgan SmartRetirement Income A | 0.73 % | Target Date | 0.64% |
| JPMorgan US Small Company R6 | 0.72 % | Domestic Equity | 0.47% |
| MassMutual Select Mid Cap Growth I | 0.71 % | Domestic Equity | 0.47% |
| Metropolitan West Total Return Bond Fund | 0.50 % | Domestic Bond | 0.43% |
| MFS Massachusetts Inv Gr Stk R3 | 0.72 % | Domestic Equity | 0.47% |
| Parnassus Core Equity Institutional | 0.63 % | Domestic Equity | 0.47% |

85.     The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 ER** | **Investment Style** | **ICI Average[12]** |
| American Century Mid Cap Value R6 | 0.63 % | Domestic Equity | 0.44% |
| Calvert Conservative Allocation A | 1.06 % | Non-target date Balanced | 0.38% |

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 ER** | **Investment Style** | **ICI Average[12]** |
| Columbia High Yield Bond Adv | 0.78 % | Domestic Bond | 0.40% |
| Fidelity Real Estate Investment Port | 0.74 % | Domestic Equity | 0.44% |
| Invesco Oppenheimer Developing Mkts R5 | 0.88 % | International Equity | 0.57% |
| JPMorgan SmartRetirement 2020 A | 0.81 % | Target Date | 0.50% |
| JPMorgan SmartRetirement 2025 A | 0.85 % | Target Date | 0.50% |
| JPMorgan SmartRetirement 2030 A | 0.86 % | Target Date | 0.50% |
| JPMorgan SmartRetirement 2035 A | 0.87 % | Target Date | 0.50% |
| JPMorgan SmartRetirement 2040 A | 0.88 % | Target Date | 0.50% |
| JPMorgan SmartRetirement 2045 A | 0.88 % | Target Date | 0.50% |
| JPMorgan SmartRetirement 2050 A | 0.88 % | Target Date | 0.50% |
| JPMorgan SmartRetirement 2055 A | 0.88 % | Target Date | 0.50% |
| JPMorgan SmartRetirement 2060 A | 0.87 % | Target Date | 0.50% |
| JPMorgan SmartRetirement Income A | 0.73 % | Target Date | 0.50% |
| JPMorgan US Small Company R6 | 0.72 % | Domestic Equity | 0.44% |
| MassMutual Select Mid Cap Growth I | 0.71 % | Domestic Equity | 0.44% |
| Metropolitan West Total Return Bond Fund | 0.50 % | Domestic Bond | 0.40% |
| MFS Massachusetts Inv Gr Stk R3 | 0.72 % | Domestic Equity | 0.44% |

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 ER** | **Investment Style** | **ICI Average[12]** |
| Parnassus Core Equity Institutional | 0.63 % | Domestic Equity | 0.44% |

86.    Given the excessive costs of the above funds they should have been replaced during the Class Period.

### (3) Several of the Plan's Funds With Substantial Assets Were Not in the Lowest Fee Share Class Available to the Plan

87.    Another fiduciary breach stemming from Defendants' flawed investment monitoring system resulted in the failure to identify available lower-cost share classes of many of the funds in the Plan during the Class Period.

88.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.  Because the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

89.    Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329

(3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

90.     The total assets under management for all of these funds was over 251 million dollars thus easily qualifying them for lower share classes.  The following chart provides detail on these funds:

| Fund in the Plan | ER | Less Expensive Share Class | Lower ER | Excess Cost |
|---|---|---|---|---|
| JTTAX<br>JPMorgan SmartRetirement 2020 A | 0.81 % | JTTYX<br>JPMorgan SmartRetirement 2020 R6 | 0.44 % | 84.1% |
| JSMAX<br>JPMorgan SmartRetirement 2030 A | 0.86 % | JSMYX<br>JPMorgan SmartRetirement 2030 R6 | 0.46 % | 87.0% |
| SMTAX<br>JPMorgan SmartRetirement 2040 A | 0.88 % | SMTYX<br>JPMorgan SmartRetirement 2040 R6 | 0.47 % | 87.2% |
| JTSAX<br>JPMorgan SmartRetirement 2050 A | 0.88 % | JTSYX<br>JPMorgan SmartRetirement 2050 R6 | 0.47 % | 87.2% |
| JNSAX<br>JPMorgan SmartRetirement 2025 A | 0.85 % | JNSYX<br>JPMorgan SmartRetirement 2025 R6 | 0.45 % | 88.9% |
| SRJAX<br>JPMorgan SmartRetirement 2035 A | 0.87 % | SRJYX<br>JPMorgan SmartRetirement 2035 R5 | 0.46 % | 89.1% |
| JSAAX<br>JPMorgan SmartRetirement 2045 A | 0.88 % | JSAYX<br>JPMorgan SmartRetirement 2045 R6 | 0.47 % | 87.2% |
| JFFAX<br>JPMorgan SmartRetirement 2055 A | 0.88 % | JFFYX<br>JPMorgan SmartRetirement 2055 R6 | 0.47 % | 87.2% |
| JAKAX<br>JPMorgan SmartRetirement 2060 A | 0.87 % | JAKYX<br>JPMorgan SmartRetirement 2060 R6 | 0.46 % | 89.1% |
| MIGHX<br>MFS Massachusetts Inv Gr Stk R3 | 0.72 % | MIGNX<br>MFS Massachusetts Inv Gr Stk R6 | 0.38 % | 89.5% |

| Fund in the Plan | ER | Less Expensive Share Class | Lower ER | Excess Cost |
|---|---|---|---|---|
| JSRAX<br>JPMorgan SmartRetirement Income A | 0.73 % | JSIYX<br>JPMorgan SmartRetirement Income R6 | 0.42 % | 73.8% |
| TGBAX Templeton Global Bond ADV | 0.67% | FBNRX Templeton Global Bond R6 | 0.56% | 19.6% |

91.     At all times during the Class Period, Defendants knew or should have known of the existence of identical less expensive share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

92.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds ***could not have*** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

93.     Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduces the likelihood that participants achieve their preferred lifestyle in retirement.

94.     Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.

95.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would

know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

96.     Here, had the Plan's fiduciaries prudently undertaken their fiduciary responsibility for determining the appropriateness of the Plan's investment offerings and monitoring investment performance, the Plan would have moved to the identical lower cost share class of the identical fund. Plan Doc. at 71.

## (4)     Several of the Funds in the Plan had Lower Cost Better Performing Alternatives in the Same Investment Style

97.     The Plan failed to replace several of the higher cost and underperforming funds which in 2019 housed over 332 million dollars in participant assets. These funds had nearly identical lower cost alternatives during the Class Period. These funds are what's known as actively managed funds. As detailed in a well-respected investment journal: "[a]n actively managed investment fund is a fund in which a manager or a management team makes decisions about how to invest the fund's money.[13]" Thus, the success or failure of an actively managed fund is linked directly to the abilities of the managers involved.

98.     Here, the performance of the managers of these funds fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or sooner. Failure to do so, cost the Plan and its participants millions of dollars in lost opportunity and revenue.

---

[13] https://www.thebalance.com/actively-vs-passively-managed-funds-453773 last accessed on November 12, 2020.

99.     There were, at least, hundreds of superior performing less expensive alternatives available during the Class Period one of which should have been selected by the Plan.

100.     The chart below choses one of these superior performing alternatives out of the hundreds available for each fund and compares them to the underperforming funds currently in the Plan:

| Current Fund | 2020 ER | Active Lower Cost Alternative | 2020 ER | % Fee Excess |
|---|---|---|---|---|
| JTTAX JPMorgan SmartRetirement 2020 A | 0.81% | RRCTX American Funds 2020 Trgt Date Retire R6 | 0.31% | 161% |
| JSMAX JPMorgan SmartRetirement 2030 A | 0.86% | RFETX American Funds 2030 Trgt Date Retire R6 | 0.35% | 146% |
| SMTAX JPMorgan SmartRetirement 2040 A | 0.88% | RFGTX American Funds 2040 Trgt Date Retire R6 | 0.38% | 132% |
| JTSAX JPMorgan SmartRetirement 2050 A | 0.88% | RFITX American Funds 2050 Trgt Date Retire R6 | 0.39% | 126% |
| JNSAX JPMorgan SmartRetirement 2025 A | 0.85% | RFDTX American Funds 2025 Trgt Date Retire R6 | 0.33% | 158% |
| SRJAX JPMorgan SmartRetirement 2035 A | 0.87% | RFFTX American Funds 2035 Trgt Date Retire R6 | 0.37% | 135% |
| JSAAX JPMorgan SmartRetirement 2045 A | 0.88% | RFHTX American Funds 2045 Trgt Date Retire R6 | 0.38% | 132% |
| JFFAX JPMorgan SmartRetirement 2055 A | 0.88% | RFKTX American Funds 2055 Trgt Date Retire R6 | 0.40% | 120% |
| JAKAX JPMorgan SmartRetirement 2060 A | 0.87% | RFUTX American Funds 2060 Trgt Date Retire R6 | 0.41% | 112% |

| Current Fund | 2020 ER | Active Lower Cost Alternative | 2020 ER | % Fee Excess |
|---|---|---|---|---|
| MIGHX<br>MFS Massachusetts Inv Gr Stk R3 | 0.72% | FDTRX<br>Franklin DynaTech R6 | 0.51% | 41% |
| RWMGX<br>American Funds Washington Mutual R6 | 0.27% | DFUSX<br>DFA US Large Company I | 0.08% | 238% |
| RFNGX<br>American Funds Fundamental Invs R6 | 0.28% | DFUSX<br>DFA US Large Company I | 0.08% | 250% |
| JUSMX<br>JPMorgan US Small Company R6 | 0.72% | BDSIX<br>BlackRock Advantage Small Cap Core Instl | 0.50% | 44% |
| RERGX<br>American Funds Europacific Growth R6 | 0.46% | VWILX<br>Vanguard International Growth Adm | 0.32% | 44% |
| MEFZX<br>MassMutual Select Mid Cap Growth I | 0.71% | BBGSX<br>Bridge Builder Small/Mid Cap Growth | 0.39% | 82% |
| CCLAX<br>Calvert Conservative Allocation A | 1.06% | VSCGX<br>Vanguard LifeStrategy Cnsrv Gr Inv | 0.12% | 783% |
| ODVIX $ 3,712,062<br>Invesco Oppenheimer Developing Mkts R6 | 0.83% | RNWGX<br>American Funds New World R6 | 0.60% | 38% |
| TGBAX<br>Templeton Global Bond ADV | 0.67% | AUBFX<br>Invesco World Bond R6 | 0.29% | 131% |

101.    Not only are the fees excessive as compared to the similar lower cost alternatives discussed above but the suggested alternative funds outperformed all of the funds significantly. The difference between the excessive fees paid for these underperforming funds and the suggested alternatives represent more lost savings each year for plan participants and have been compounded over the years.  The underperformance of these funds as compared to the suggested alternatives

increases these damages exponentially. The underperformance of these funds is represented in the chart below:

| Fund | Benchmark | Lower Cost Alternative | Benchmark Relative | | |
|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y |
| JPMorgan SmartRetirement 2020 A | Vanguard Target Retirement 2020 Inv | American Funds 2020 Trgt Date Retire R6 | -2.9% | -1.71% | -1.46% |
| | | | 0.05% | -24.00% | -0.18% |
| | | | | | |
| JPMorgan SmartRetirement 2030 A | Vanguard Target Retirement 2030 Inv | American Funds 2030 Trgt Date Retire R6 | -3.27% | -1.67 % | -1.32 % |
| | | | 2.38% | 0.89 % | 0.89 % |
| | | | | | |
| JPMorgan SmartRetirement 2040 A | Vanguard Target Retirement 2040 Inv | American Funds 2040 Trgt Date Retire R6 | -2.45% | -1.71 % | -1.46 % |
| | | | 4.11% | 1.78 % | 1.37 % |
| | | | | | |
| JPMorgan SmartRetirement 2050 A | Vanguard Target Retirement 2050 Inv | American Funds 2050 Trgt Date Retire R6 | -2.84% | -1.78 % | -1.63 % |
| | | | 4.37% | 2.02 % | 1.52 % |
| | | | | | |
| JPMorgan SmartRetirement 2025 A | Vanguard Target Retirement 2025 Inv | American Funds 2025 Trgt Date Retire R6 | -3.01% | -1.75 % | -1.43 % |
| | | | 2% | 0.45 % | 0.31 % |
| | | | | | |

| Fund | Benchmark | Lower Cost Alternative | Benchmark Relative | | |
|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y |
| JPMorgan SmartRetirement 2035 A | Vanguard Target Retirement 2035 Inv | American Funds 2035 Trgt Date Retire R6 | -2.48% | -1.69 % | -1.39 % |
| | | | 3.75% | 1.59 % | 1.46 % |
| JPMorgan SmartRetirement 2045 A | Vanguard Target Retirement 2045 Inv | American Funds 2045 Trgt Date Retire R6 | -2.82% | -1.79 % | -1.61 % |
| | | | 4.03% | 1.86 % | 1.39 % |
| JPMorgan SmartRetirement 2055 A | Vanguard Target Retirement 2055 Inv | American Funds 2055 Trgt Date Retire R6 | -2.8% | -1.76 % | -1.60 % |
| | | | 4.3% | 1.98 % | 1.50 % |
| JPMorgan SmartRetirement 2060 A | Vanguard Target Retirement 2060 Inv | American Funds 2060 Trgt Date Retire R6 | -2.98% | -1.77 % | -- |
| | | | 4.23% | 1.96 % | 1.46 % |
| MFS Massachusetts Inv Gr Stk R3 | iShares Russell 1000 Growth ETF | Franklin DynaTech R6 | -17.42% | -3.01 % | -2.46 % |
| | | | 10.79% | 5.47 % | 4.66 % |
| American Funds Washington Mutual R6 | iShares Russell 1000 Value ETF | DFA US Large Company I | 9.56% | 5.69 % | 4.35 % |
| | | | 20.27% | 9.74 % | 6.61 % |

| Fund | Benchmark | Lower Cost Alternative | Benchmark Relative | | |
|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y |
| American Funds Fundamental Invs R6 | iShares Russell 1000 ETF | DFA US Large Company I | -3.52% | -3.28% | -1.08% |
| | | | 20.27% | 9.74% | 6.61% |
| | | | | | |
| JPMorgan US Small Company R6 | iShares Russell 2000 ETF | BlackRock Advntg Small Cap Instl | -0.01% | -1.15% | -1.69% |
| | | | 0.89% | 2.15% | 0.37% |
| | | | | | |
| American Funds Europacific Growth R6 | iShares MSCI EAFE Growth ETF | Vanguard International Growth Adm | 2% | -1.09% | 0.18% |
| | | | 36.35% | 9.31% | 9.68% |
| | | | | | |
| MassMutual Select Mid Cap Growth I | iShares Russell Mid-Cap Growth ETF | Bridge Builder Small/Mid Cap Growth | -7.81% | -3.06% | -1.46% |
| | | | 4.2% | -1.79% | -0.59% |
| | | | | | |
| Invesco Oppenheimer Developing Mkts R6 | iShares MSCI Emerging Markets | American Funds New World R6 | '-0.21% | 2.67% | 2.09% |
| | | | 3.69% | 5.86% | 2.90% |
| | | | | | |
| Templeton Global Bond ADV | AdvisorShares FolioBeyond Smt Cor Bd ETF | Invesco World Bond R6 | '-5.16% | -4.39% | -2.43% |
| | | | 5.61% | 1.43% | 0.72% |

102.    Two of the funds in the Plan, discussed above, had some of the worst performance histories of all their peers. As of the third quarter of 2020, the Templeton Global Bond was worse

than 89% of its 293 peers at the three year mark, 81% worse than 276 of its peers at the 5 year

mark. The JPMorgan SmartRetirement 2035 A fund performed worse than 87% of its 191 peers at

the 3 year mark and 80% of its 170 peers at the 5 year mark.

103.    As detailed in the chart above, the comparator funds in the chart easily

outperformed the funds in the Plan at the 1, 3  and 5 year marks. A prudent fiduciary should have

been aware of these better preforming lower cost alternative and switched to them at the beginning

of the Class Period.  Failure to do so is a clear indication that the Plan lacked any prudent process

whatsoever for monitoring the cost and performance of the funds in the Plan.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against BHS and the Board)

104.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this

Complaint as if fully set forth herein.

105.    At all relevant times, BHS and/or the Board Defendants and its members during the

Class Period ("Prudence/Loyalty Defendants") were fiduciaries of the Plan within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or

control over the administration and/or management of the Plan or disposition of the Plan's assets.

106.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties

imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the

assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries,

and acting with the care, skill, diligence, and prudence under the circumstances that a prudent

person acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of like character and with like aims.

107.    The Prudence/Loyalty Defendants breached these fiduciary duties in multiple

respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's

investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, the Prudence/Loyalty Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence/Loyalty Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.

108.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

109.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

110.    The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: December 30, 2020

**PLAINTIFFS**
**MATTHEW W. COVIELLO, NATHAN BYRNE and VICTORIA HALSTED, individually and on behalf of all others similarly situated,**

/s/ *Jeffrey Hellman*                    .
Jeffrey Hellman
BBO # 549896
**Law Offices of Jeffrey Hellman, LLC**
195 Church Street, 10th Floor
New Haven, CT  06510
Tel.: 203-691-8762
Fax: (203) 823-4401
jeff@jeffhallmanlaw.com

**CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey               .
Donald R. Reavey, Esquire
PA Attorney ID #82498
(*Notice of Special Appearance to be Filed*)
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh          .
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Notice of Special Appearance to be Filed*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class